## HUNTER'S ESTATE.

The popular meaning of words is the best criterion of the intent of a testator; and technical words of general import will be restrained, if coupled with provisions which are not applicable, in the common acceptation thereof, to particular species of property.

Hence, when a testator directed his executors to sell all his real and personal estate, and to distribute the proceeds among certain children, his bonds, notes, and cash, do not pass under such bequest, but by the residuary clause.

A testator ordered and directed his executors to sell, at public sale, all his real and personal estate that he might be possessed of at the time of his death; and the proceeds of such sale, after deducting therefrom all legal charges, he gave and bequeathed, principally, as follows:—to his daughter Catharine, one equal fourth part of the money arising from the sale of his real and personal estate; to his daughter Margaret, one equal fourth part thereof; to his daughter Mary, one equal fourth part thereof; and unto his son, Daniel Hunter, and to his heirs and assigns,

the remaining one-fourth part thereof, together with the wearing apparel, "*and the residue and remainder of testator's estate not herein before bequeathed, to hold the same to him, the said Daniel Hunter, his heirs and assigns for ever.*" Part of the personal estate of the testator consisted of bonds, notes, and cash, which, at the time the inventory was filed, amounted to more than $15,000.

*Held,* that when the testator directed his executors *to sell all his real and personal estate,* he evidently meant that kind of property which it was usual to sell, according to the customs of the country, and that the *bonds and notes* were *not intended by him to be* included in such direction; that the bonds and notes did not pass under the bequests of testator, of the one-fourth part of the moneys arising from the sale of his real and personal estate, to each of the four legatees named in his will, as entitled to such share thereof; but that they passed as an additional bequest, to his son, Daniel Hunter, one of the said legatees, under the residuary clause in the will.

THIS was an appeal by George Christman and Catharine his wife, Jacob Reiter and Margaret his wife, Gideon Hill and Susanna his wife, and others, from the decree of the Orphans' Court of Berks county, setting aside the *first*, and confirming the *second* report of auditors appointed to audit, re-settle, and re-state the account of Daniel Hunter and George Christman, executors of the last will and testament of John Hunter, deceased, and by a subsequent order, to make distribution of the balance in the hands of the executors, amongst those entitled under the will of the testator.

The questions presented in the Orphans' Court, as well as in this court, for decision, were, whether the bonds, notes, and cash, which amounted to more than $15,000, when the inventory was filed, *were included in the direction* of testator to his executors, *to sell at public sale all his real and personal estate, that he might* be possessed of at the time of his decease, *and in the bequests* of testator to his daughters, namely:—to Catharine, then the wife of George Christman, Margaret, then the wife of Jacob Reiter, Mary, the mother of Susanna Lenhart now intermarried with Gideon Hill, and to his son, Daniel Hunter, *of the one equal fourth part, each,* of the moneys arising from the sale of his real and personal estate, or whether they passed to his son Daniel, under the residuary clause, in the seventh item of the will, in addition to the one equal fourth part of the money arising from the sale of testator's real and personal estate. The following is a copy of the will:—

"Item 1st. It is my will and I do hereby order and direct my executors hereinafter named, or the survivor of them, to proceed as soon as they may deem most advantageous to my estate, after my decease, *to sell at public sale all my real and personal estate that I may be possessed of at the time of my decease,* (except the articles which I hereinafter bequeath to my daughter Mary,) and I do hereby authorize and empower my said executors, or the survivor of them, to make, execute, seal and deliver to the purchaser or p~~

chasers thereof, as good a deed or deeds of conveyance in fee-simple for the same as I myself could do, if living; and my execu-tors shall have power to sell my real estate, in the whole or in such parcels as they may think most advantageous to my estate, *and the moneys arising from the sale of my real and personal estate,* (all legal charges deducted therefrom,) I give and bequeath as follows, to wit:—

"Item 2d. I give and bequeath unto my grandchildren, that is to say, the children of my daughter Elizabeth, deceased, who was intermarried with Henry Scmeck, and to their heirs and assigns, forty dollars to be equally divided among them, share and share alike.

"Item 3d. I give and bequeath unto my daughter Catharine, *one equal fourth part* of the money arising from the sale of my real and personal estate, (deducting therefrom the sum of one thousand dollars, which I have paid for her heretofore.) . Whereas, my daughter Catharine has intermarried with George Christman, and has also three children living by her first husband, Abraham Bar-tow, deceased: it is my will that if the said George Christman will give good and sufficient security to the other of my executors hereinafter named, for the above bequest, that the above said bequest shall be paid over to him, and after the decease of my said daughter Catharine, the same shall be paid out of his estate to all the chil-dren of my said daughter Catharine, as well to those she had with Abraham Bartow, deceased, as those she has or may have with the said George Christman, to be equally divided among them.

"Item 4th. I give and bequeath unto my grand-daughter Maria Griescmer, daughter of my daughter Margaret, and to her heirs and assigns, the sum of three thousand dollars, to be paid to her by my executors hereinafter named, in one year after my decease. The said three thousand dollars to be deducted from *one-fourth part* of the moneys arising from the sale of my real and personal estate; and the remainder of *said fourth part,* after the sum of seven hundred dollars more are deducted therefrom, which I have paid for my daughter Margaret, I give and bequeath to her, my said daughter Margaret; and my executors hereinafter named shall place the same on interest, on good security, and the interest accru-ing thereon they shall pay to my said daughter Margaret for her. support and maintenance during her natural life, and after her decease, the principal sum shall be equally divided among all her children, including the two natural children which she had by Charles Witman, and in case any of said children should die in their minority, his share shall be equally divided among the sur-vivors of them.

"Item 5th. I give and bequeath to my daughter Mary, and to her heirs and 'assigns, two cows, and the household furniture, bedding, &c., which I purchased and provided for her, my said daughter Mary. I do further give and bequeath to my said daughter Mary, and to her heirs and assigns, *one equal fourth part* of the money arising from the sale of my real and personal estate, deducting thereout the sum of eight hundred dollars, to be paid to her by my executors hereinafter named, as soon as my estate is settled up. My will is, and I do hereby order and direct, that if my daughter Mary should see proper to leave, by will or otherwise, the whole or any part of her portion to her daughter, Susanna Lenhart, and the said Susanna should give any assistance to her father, Jacob Lenhart, out of the share, so as aforesaid left to her by her mother, if the same can be proved to the satisfaction of my executors hereinafter named, *then her share; or any part remaining thereof, shall immediately revert back to my other children, to be equally divided among them.*

"Item 6th. I give and bequeath unto the children of my son, John Hunter, deceased, and to their heirs and assigns, the sum of five dollars, to be equally divided among them, and to be paid to them by my executors hereinafter named, in one year after my decease, *my said son, John Hunter, having received from me in his lifetime, as rent for the farm on which he resided, and otherwise, his full share of my estate.*

"Item 7th. I give and bequeath unto my son, Daniel Hunter, and to his heirs and assigns, *the remaining one-fourth part* of the money arising from the sale of my real and personal estate, together with the wearing apparel, *and the residue and remainder of my estate not hereinbefore bequeathed,* to hold the same to him, my said son, Daniel Hunter, his heirs and assigns for ever.

"Item 8th. It is my will, that if any one of my executors hereinafter named, should wish to purchase any of my real estate, that they shall have the same right of doing so, that any other person may have, and the other executor shall convey the same to the other, if he should purchase in as clear and ample a manner as I ever held and enjoyed the same.

"Item 9th. I do hereby order and direct, that the several sums of money which shall be deducted from the share bequeathed to my said daughters, *shall be considered as part of my estate, and distributed among my legatees in equal shares.*

"Item 10th. If any of aforenamed children or grandchildren should bring any account or charge against my estate, for services

rendered, or any demand whatever; the same amount shall be deducted *out of his or their respective shares ;* and if any one of them should commence any suit or quarrel, in the distribution of my estate, *the one so offending against this, my will, shall forfeit his whole share of my estate, and the same shall be equally divided among my other legatees."*

It appeared, that the cash, bonds, and notes, after deducting the debts of testator, the expenses of administration, &c., amounted to $15,140 53 ; and that the whole estate amounted to $42,182 64. The auditors, *in their first report,* reported in favour of that construction of the will of the testator, which gave to his daughters, Catharine, Margaret, Mary, and his son Daniel, each, the *one-fourth part* of the money arising from the sale of the whole estate, including the cash, bonds, and notes.

The court, (BANKS, P. J.,) in the conclusion of the opinion setting aside this report, on exceptions filed thereto, said :

"How is this residue thus contemplated by him, as not having been bequeathed to be raised ? It is to be found only in the money that he might have at the time of his death, and in debts due to him. I do not think that the testator intended that his money and choses in action should be sold at public sale, nor do I think he intended to embrace them as part of the money arising from the sale of his real and personal estate, but that he intended to reserve them as an additional bequest for Daniel, beyond what he had given to his other children. Taking the whole will together, this is the conclusion to which my mind has come. I therefore restrict the order to sell all his personal estate, to his goods and chattels, properly so called, and hold it not to extend to money and choses in action. I do this to effectuate what I deem a clearly apparent intention, on the part of the testator, to reserve for Daniel his money and choses in action, in addition to the one-fourth part of the money arising from the sale of his real and personal estate."

The account was, thereupon, referred back to the same auditors, to be corrected according to the opinion of the court.

The second report of the auditors made, in conformity with the opinion of the Orphans' Court, was confirmed. From this decree, an appeal was taken to this court, and the opinion and decrees of the Orphans' Court assigned for error.

The case was argued, at May Term, 1846, by *Barr* and *Davis* for appellants, and by *Strong* and *Meredith* for appellee ; and reargued at May Term, 1847, by *Barr* and *Gordon* for appellants, and by *Strong* and *Banks* for appellee.

I 2

For appellants, it was contended, that by the terms of the will, the testator directed his executors to convert his whole estate into money, and to distribute the money thence arising in equal shares among all his children: except such of them as he thought it just to the others to exclude from any participation therein. The terms in which he describes the property thus directed to be divided, are the largest known in the law : *all his real and personal estate. Estate,* both in England and America, is *genus generalissimum ;* Countess of Bridgewater *v.* Bolton, 6. Mod. 107 ; Turbett *v.* Turbett, 1 Yeates, 191 ; 5 Burr. 2639 ; 6 Cruise, tit. *Devise,* ch. 10, sec. 63 ; 1 Mod. 107. It consists of two kinds—real and personal—and the testator used them both. They comprise every thing a man can own. But much less extensive words are sufficient to pass bonds, notes, and money, or cash. " Goods and movables," " chattels and effects," include bonds and notes : Jackson *v.* Robinson, 1 Yeates, 101 ; 1 P. Wms. 267 ; 2 Shep. Touch. 447 ; 6 Dav. 345 ; 2 Fonb. 332, n. 6. Any one, who understands the English language, must know, that when he gives away all his real and personal estate, all that he has in the world will pass. The general scope of the will was equality. All his children were to be made equal, except two : the children of Elizabeth Scmeck, and of John Hunter, a son. Why the children of Elizabeth were excluded, is not avowed in the will. But the reason given for excluding John, was based upon the intention of making all equal. John had received his full share of the estate. Even Elizabeth Scmeck's children were to receive $40 each ; and the four principal and particular legatees, including Daniel, the appellee, were to receive each equal shares.

General intent to be carried out, though at the expense of a particular intent ; Findlay *v.* Riddle, 3 Bin. 150 ; Evans *v.* Davis, 1 Yeates, 332 ; Ruston *v.* Ruston, 2 Dall. 244 ; Sloan *v.* Hanse, 2 Rawle, 28 ; Marshall's Estate, 2 Barr, 388 ; words supplied, Jackson *v.* Strang, 1 Hall's Rep. 1. In Chapman. *v.* Brown, 3 Burr. 1634, Lord Mansfield states at length, what may be done with words to effectuate testator's intent ; 4 Kent's Com. 535, n. b ; 1 Jarman on Wills, 411 ; and notes ; Id. 419.

The direction of the testator was " to sell, at public sale, all his real and personal estate," and all the money arising from the sale of his real and personal estate, all legal charges deducted therefrom, he bequeaths, principally, to four particular legatees, in equal shares. Now this was a mere direction to convert into cash, and the testator so intended. If the words, " *and convert into money,*" were supplied, it would relieve the case from all difficulty,

or rather there would be no difficulty in giving a construction to the direction *to sell at public sale*. But if the bonds and notes had been expressly ordered by the testator to be sold, *they would not have been sold*. What do we sell for? To get the money for the thing sold. But if we get the value of the chattel without a sale, why sell? The testator understood this, and did not order sale of bonds and notes. But he did order two things, to wit: to sell all his real and personal estate, and *how* the money arising from such sale should be distributed. All debts, legal expenses, and certain legacies were to be paid out of it; and the balance of the money, the testator intended, by the use of the words, to divide amongst his four particular legatees equally. To do this more conveniently, all his real and personal estate was to be reduced to money. But is there any objection to a sale? At common law, it is true, choses in action could not be sold, nor can ordinary debts, at this day, be transferred, so as to vest a right of action in the vendee. But in equity they have always been transferable; Sto. Eq. 1040. All difficulty, however, on this score, is obviated, by an act of Assembly, not only recognising the right to sell, but giving an action to the assignee of a bond, in his own name.

The words "possessed of at the time of death," have been held to enlarge other words, and not to restrain them; as in Bennett *v.* Bachelor, 3 Bro. C. C. 29; Michell *v.* Michell, 5 Madd. 69; Flemming *v.* Burrows, 1 Russ. C. Rep. 276; Sutton *v.* Sharp, Id. 146; Kendall *v.* Kendall, 4 Russ. C. Rep. 360; 1 Jarm. on Wills, 699. If the thought of making a residue, to satisfy the residuary clause, had not occurred, no one would have doubted the sufficiency of the words in question to carry all the estate. If there had been no residuary clause, no one would have doubted the efficacy of the words in question to carry the whole of the money arising from the sale of the real and personal estate, including the bonds, notes, and cash. If the words and provisions of the will, in their common acceptation, are sufficient to pass the whole of the testator's property, no rule of law or equity requires the courts to take from legatees for the purpose of creating a residue. The words of the residuary bequest are, " the residue and remainder of my estate, not herein before bequeathed, to hold to him and his heirs and assigns for ever." Hence it is, by express words, confined to such estate as had not before been given. This, it is true, is nothing more than what the law would imply. But all his estate had already been disposed of, or given, " Not before disposed of," means not before expressed, to be given, or disposed of; 2 Pow. Dev. 105. Now, what is the

effect of such bequest ? The words of the residuary clause are but *general and ordinary words*, used most frequently without any particular design, and have no further effect than to pass what has *not been given*, or what was *insufficiently given*. They never have the effect *of putting a construction* on a previous clause in a will, *in order to create* a residue. For it is a well-settled rule, *that because a testator has seen fit to append a residuary clause to his will,* that there must be a residue; Inchquin *v.* O'Brien, 1 Wils. 82, 84. It will not even have the effect of discharging the personalty, and throwing the debt on the realty, in order to create a residue to satisfy the clause of the will. In construing this will, the court will either disregard this word *residue* as unmeaning, or impossible to operate. Inchquin *v.* O'Brien, already cited, shows the fact, that a gift of a *residue* by no means indicates *that a residue must exist*. Devise of all his goods, *estate, bonds and debts, to his executors to be sold,* and proceeds applied as directed : the word *estate* can have no meaning, unless applied to real estate, for the personalty is passed by other words; 1 Cox, 362 ; Jones *v.* Colebrook, 8 Ves. 42; words repugnant to an express previous devise, will be rejected; Cotton *v.* Stenlake, 12 East, 515 ; *Smith.* v. *Pybus*, 9 Ves. 566. The word *residue* is but a word of inference; it is no gift of any particular thing, but of that not before given. Express gift not to be controlled by *inference;* Collet *v.* Lawrence, 1 Ves. jun. 269. The bequest of the proceeds of the sale of real and personal estate, is a gift of the estate itself. Gift of produce of legacy, gift of legacy itself; Elton *v.* Shephard, 1 Bro. C. C. 532 ; Gilbert *v.* Campbell, 6 Wheat. 77 ; Bennett *v.* Robinson, 10 Watts, 348. But how, it may be said, are the words giving the residue to be fulfilled, for all words are to be construed, and given effect to. The answer is plain : all lapsed legacies will pass thereunder; 1 Ves. sen. 322. These might have been several, as *four* years intervened between the date of the will and the death of the testator.

In the account presented, Daniel Hunter neither claimed the cash in hand, the bonds and notes, nor the interest that accrued upon them after the inventory was filed. He never claimed them until after the auditors appointed to settle, &c., had met several times, in the performance of their duties, and were about closing their labours.

One cannot look at the results of the construction contended for on the other side, without being shocked at the injustice it produces. It is evident that John and Elizabeth had received more than their full share under any circumstances, and that Catharine,

Margaret, Mary, and Daniel, were to get the estate, to be substantially divided with equality among them; each accounting for what she had already got, which would have given each $11,228 26½.

By the decision which is attempted to be supported, each of the other three gets $7371 77.

| | | |
|---|---|---|
| Daniel gets the same . . . . . | $7,371 | 77 |
| and the proceeds of the bonds and notes . | 15,140 | 53 |
| | | |
| Thus he gets . . . . . . | $22,512 | 30 |
| whilst the other three together get . . . | 22,115 | 31 |
| | | |
| Or . . . . . . . . | $396 | 99 |

more than the whole three.

*Strong* and *Banks*, for appellee, after referring to the provisions and words of the will, and stating the questions, contended, that the will was the only guide by which to ascertain the true construction thereof, and to carry into effect the intention of testator. If Daniel did not claim the bonds, notes, and cash, as residuary legatee, the court may *now* place themselves in situation of testator; Wigram on Wills, 76, 77, 88 and 89; 1 Jarman, 349, 357, 358, and note to 1 and 2. Conceded, that a devise and bequest of real and personal estate would carry bonds, notes, and cash. Bonds and notes may be sold; but here testator did not intend it. Would anybody suppose executors *bound*, under will of John Hunter, to put up the bonds and notes at public sale? Suppose it was sought to charge the executors because they had not sold them. Testator intended that his executors should sell that kind of personal estate only which is usually sold. Object of construing wills to get at intention of testator. When it is doubtful what kind of property is referred to, it is to be classed with articles of the same nature; Rule of *ejusdem generis ;* Jarman on Wills, 692, 693, 694, 695, 696. The words, *"effects, goods and chattels,"* will pass all, unless restrained; Jarman on Wills, 657, 658. The word *estate*, connected with words more limited, will restrict it; 13 Ves. 39; 1 Eq. Ca. Abr. 201. Every sentence and word must be considered; 3 Yeates, 187; Ram. on Wills, 98; 1 Yeates, 518; 8 Term Rep. 582; 2 Barn. & Ald. 448, 451; 2 P. Wms. 280; 2 Merivale, 25. Duty of court to find a residue, when created and given by will. "Remainder of my worldly substance," would pass every thing except fancy stocks; Delameter's Estate, 1 Whart. 362. Bank-stock will not pass by the word

*money,* which produced it.   Devise of "all my *goods,*" does not pass bonds and notes, because there would be no residue.   Courts will construe wills so as to make a residue, when the will contains a residuary clause; Jackson *v.* Robinson, 1 Yeates, 101.   Restrictive rules; 1 Jarman, 694, 700.   It was not the intention of testator to make all his children equal.   No fund but residue to pay particular legacies.   Testator never intended his bonds and notes to be sold, and what he did not intend to be sold, he did not intend to distribute.   Testator speaks of estate in possession by him at time of his death.   Choses in action are not things in possession, and would not pass here for want of description.   Under residuary clause, it was intended to give Daniel the bonds, notes and cash, in addition to the one-fourth part of the money arising from the sale of the real, and also of the personal estate, properly so called. .

*June* 21.   COULTER, J.—If any thing is distinctly and authoritatively settled in our law, it is, that in the construction of wills the intent of the testator, collected from the words and language of the whole will, must be the guide to legal conclusion, and the governing principle of judgment.   It would be a mere affectation of learning to cite cases for the purpose of establishing this axiom.   We know that a testator is, in most cases, *inops concilii,* and that the scriveners employed are generally as little versed in the rules of law and chancery principles as the testator himself.   The intent must therefore be gathered from the words of the will, as such words are understood and accepted by the common mind.   It would be a mere mockery of justice to allow the privilege of making a will to an unlearned man, and then interpret it according to artificial rules, of which he knew nothing, and had probably never heard.   According to that rule of construction, the lawyers and the court would make the will, and not the testator.   It is true, that in cases where the courts have established a construction upon a given collocation of words, such decision would be entitled to great respect and consideration, where words of similar collocation, and like import, occurred in another will; but it would only be regarded as a key and help to the true construction.   Shades of difference will always occur, which, although slight, may give a different aspect and meaning, and therefore, as absolute authority, cases are of little authority in the true construction of testamentary dispositions by will.   Certainly, wills must be conformable to the rules of law; but this is not and cannot be applied to the construction of words; it relates solely to the nature and extent of the

estate or interest granted; 2 Atk. 580. A man shall be allowed to speak his mind in his will, per Justice Reynolds; Fitz-Gibbon's Rep. 113; and the learned, accurate, and searching Mr. Butler, in his note on Co. Litt. 379, a, states, "that no rule of law has a more ancient origin than that, if a testator expresses his intention defectively, either by not using technical and artificial terms, or by using them improperly, yet if his intention can be collected from his will, the law, however defective his language may be, will construe his words according to his intention."

The first thing, therefore, is to ascertain what the object of the testator is; the next, whether it is such as the rules of law and equity admit. This is the sum and the substance of the common sense and the law on the subject. I will, therefore, take up the will, and ascertain what the true intent of the testator was, according to the common acceptation and meaning of the words which he uses for the purpose of expressing that intent. He directs his executors, "as soon as they may deem advantageous *to my estate* after my decease, to sell all my *real and personal estate* that I may be possessed of at the time of my decease." It would appear, from this affirmative clause, that the meaning which the testator affixed to the word *estate*, was general and more comprehensive than what he intended, by the words *real and personal estate;* because, as soon as it shall be deemed advantageous to his *estate*, (thus meaning his whole estate,) the real and personal shall be sold. If he had not in his mind something beyond and over what he understood to be comprehended by the words, real and personal estate, why provide that it should be sold when it was advantageous to his *estate ?* The difficulty arises out of the meaning to be taken from the words, *personal* estate. And, that it was limited, in the mind of the testator, is apparent from the manner in which he uses the general word, *estate*, in juxtaposition, and in contrast with the words, real and personal estate.

This accords entirely, as I apprehend, with the common acceptation of the terms, real and personal estate. Few individuals understand them, to designate and include bonds, debts due by book account, or money in the pocket, or in the chest, or on deposit; but when a person would speak in common parlance, or even by written and printed advertisements, of selling his real and personal estate, who would understand him to mean, his money on hand, his bonds, and his book accounts? And when a testator directs his executor to sell his real and personal estate, who is so opaque as to understand that he meant and intended, that his bonds and

money should be sold? If, then, he did not intend that they should be sold, it is clear that he did not suppose he was including them, by the description of real and personal estate. In the case of Archer *v.* Duval et al., 1 Peters, 589, Chief Justice Marshall says, in speaking of the will, "in this clause, the word estate is plainly confined to personalty." He adds, in another part, "when, therefore, the testator directs that an appraisement only of his estate be made, and that no sale of furniture shall take place, he obviously applies the term exclusively to that kind of property, the appraisement of which is directed by law, and is usual." So in the case at bar, the testator evidently meant that kind of property, by the terms real and personal estate, which it was usual to sell, according to the customs of the country.

Our own statutes afford pregnant evidence, that in the common understanding of the country, the words, personal estate, are often used in a limited sense, so as not to include bonds, notes, and money. In the act of 24th February, 1834, relating to executors and administrators, it is provided, that the executors or administrators of a decedent shall have the *whole of the personal estate* of the decedent, which shall have come to their knowledge, appraised, and return the inventory thereof; and in the 5th section, it is further provided, that all bonds, notes, and other evidences of debt, &c., shall be included in the inventory. This evinces that the legislature did not understand the words, "the whole of the personal estate," *ex vi termini*, to include bonds, notes, &c. So, also, the act of 16th June, 1836, enacts, in the second clause of 19th section, that the personal estate of the defendant shall be liable to execution; and in the third clause, that the real estate shall also be subject to execution: and then, the 22d section provides, that stock owned by the defendant shall also be liable, as also debts due to him; and the 24th section, that current gold, silver, and copper coin, as also bank notes, shall be subject to execution. By these provisions, full evidence is afforded, that the legislature conformed their enactments on the subject to the common apprehension of the people, and that they seized and embodied the living manners, customs, and understanding of the common mind on the subject-matter—always the wisest and safest course for the law-making power to adopt.

When, therefore, the testator directed his real and personal estate to be sold, and after deducting all legal charges, provided, that the moneys arising from such sale should be disposed of as he directed, we are of opinion that he did not include in that disposi-

tion his bonds, notes, and money, but that they were disposed of in the manner that will be noticed hereafter. It would have been entirely out of the usual course of business, unnecessary, and exposing the estate to probable loss, to adopt such an expedient.

But the counsel of the appellants contended, that the product of the bonds and notes, together with the money on hand, are carried by the bequests to the four legatees specifically named, as entitled to the one-fourth of the product of the sale of the *real and personal estate*, and they urged this position with great zeal. But like strong men entangled in the Serbonian bog, every struggle involved them in more inextricable difficulties. In the first place, the position is in opposition to the express words of the will. The language is, that the product of the sale of my real and personal estate shall be disposed of as follows; and then directs that the one-fourth of the product of the *sale of my real and personal estate* shall be given to my daughter Catharine, with the deduction of a certain specified sum, and then disposes to each of his other living children, being two daughters and a son, one-fourth of the product of the sale of his real and personal estate, deducting from the share of each of his daughters a specified sum. He then gives to the children of a deceased son $40; and the amount of the deductions from the shares of his daughters, he directs shall be equally divided among all his legatees in equal shares. The bequest to Daniel, his only living son, is in these words: "I give and bequeath to my son Daniel, and to his heirs and assigns, the remaining one-fourth part *of the sale of my real and personal estate*, together with the wearing apparel, and the *residue and remainder of my estate not herein before bequeathed.*"

The testator here clearly indicates, that a portion of his estate was not before bequeathed; but the argument of the appellants' counsel is founded on the assumption that the whole estate of the testator was before bequeathed, and that there was nothing for the bequest of the residuum to operate upon. Against this assumption I oppose the clearly expressed mind of the testator himself, which I presume is sufficient authority. It was vehemently urged that no farmer of Berks county would perpetrate such injustice as to give so large a disproportion and surplus to his son, over his daughters. This argument is not entitled to much weight here. The farmers of Berks, like the farmers of every other county in the state, are, I presume, sensible people, and know that every man has a right to make his will as he pleases, provided he contradicts no established rule of law, and that courts are bound to carry such will into execu-

K

tion. The lights and shadows of paternal affection are not the subjects of scrutiny here. But if I were to consult a large experience, derived from others, and a more limited one gathered from my own observation, I would say that nothing is more common in this state, than to give a large preference to an only surviving son.

Two of the daughters, and perhaps all, were married, and since the days of Adam, a woman has left her father and her mother to cleave unto her husband. It is considered as a kind of going out from the family; whilst the only surviving son takes down to another generation the name, and often the largest share of the testator's estate. It may be a perverted affection and a small ambition, but it exists, and accounts for the preference.

The repetition of the words, the product of the sale of my real and personal estate in each bequest, particularly as they are used in contrast with the word estate, in the beginning of the will, in the clause disposing of the deductions from the shares of the daughters, and in the residuary clause, shows that the testator meant a different thing by the one, and the other, and when he adds in the residuary clause these words, "the remainder of my estate not herein before bequeathed," he manifests with sufficient clearness that he thought he had not disposed of his whole estate, by disposing of the product of the sale of his real and personal estate; and that he meant the bequest of the residue, or remainder not before disposed of, to carry his bonds, notes and money, that being the only matter or thing not previously bequeathed.

It is in vain to allege that a bequest of the residue of an estate is but a matter of form, and often introduced by the scrivener. It is enough to say, that it is a part of the will, and must be so considered. The primary intent indelibly impressed on the whole face of the will is inequality, and that the testator designed to prefer his surviving son. He gives him an equal share of the deductions from the portions of the daughters, he gives him the wearing apparel, always considered a memorial of affection, and he gives him the residue. The most that can be predicted upon authority well established is, that a residuary clause will not limit or detract from what has been already given, leaving it full scope and operation, however, upon all which had not been bequeathed or devised. That is its legitimate, just, and common sense effect.

We are of opinion that the residuary bequest to Daniel, of all the residue and remainder of the estate not before bequeathed, carried the bonds, notes, and other choses in action, together with the money on hand at the testator's death.

The appellants invoke the aid of that clause in the will, whereby the testator directs, that if any one of his children or grandchildren should commence any suit or quarrel about the distribution of his estate, such legatee shall forfeit his share. But that is a two-edged sword. Who commenced the dispute? They are all *in pari delicto*. The daughters, and the husbands of those who are married, affirming that the will ought to receive a particular construction, and the son alleging that it ought to receive another. Who, then, is in the fault of offending against the provision? Courts have considered directions of this kind in a will, as held up *in terrorem*, and designed to prevent disputes, rather than an injunction upon the just and equitable decision of disputes which arise. The general power of the law to determine upon the rights of the parties is not ousted; Pray et al. *v.* Belt et al., 1 Peters, 670. The court think they perceive the clear intent of the testator manifested in the whole, and every provision of the will taken together, and that is the light which they have followed in arriving at the conclusion which they adopted.                     Decree affirmed.